IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JAMES SIMMONS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | No. 4:19cv3301 |
| | § | |
| UBS FINANCIAL SERVICES, INC. | § | Jury Trial Demanded |
| and PRELLE FINANCIAL GROUP, | § | |
| INC., | § | |
| | § | |
| Defendants. | § | |

## COMPLAINT

Plaintiff James Simmons files this Complaint against Defendants UBS Financial Services, Inc. and Prelle Financial Group, Inc.

## Parties

1. Plaintiff James Simmons is an individual residing in Texas.

2. Defendant UBS Financial Services, Inc. is a Delaware corporation with its principal place of business in Weehawken, New Jersey. UBS may be served with process through its registered agent, Corporation Service Company dba Lawyers Incorporating Service Company, 211 E. 7th Street, Suite 620. Austin, Texas 78701-3218.

3. Defendant Prelle Financial Group, Inc. is a Texas corporation with its main office in Houston, Texas. Prelle Financial may be served with process through its registered agent, Frederick W. Prelle, Jr., 4848 Loop Central Drive, Suite 1005, Houston, Texas 77081.

## Jurisdiction and Venue

4. This Court has federal question jurisdiction because the case arises under Title VII of the Civil Rights Act of 1964. The Court has supplemental jurisdiction over the state law claim.

1

5.     Venue is proper because the events in question occurred in this District.

### Claim for Relief

6.     Mr. Simmons markets life insurance products.  He had a longstanding relationship with UBS, which is a brokerage house.  Starting around 2002, he marketed and sold life insurance products to clients of UBS as a third-party wholesaler.  He regularly worked at UBS's offices in the Houston area.

7.     At the end of 2011, Mr. Simmons became an employee of UBS.  This lasted until August 2015, when UBS told Mr. Simmons that he could continue marketing insurance to its clients only if he went to work for Prelle Financial Group d/b/a Capitas Financial of Houston.  Mr. Simmons agreed to do so.  He thus returned to operating as a third-party wholesaler to UBS.  None of the claims in this lawsuit arise out of Mr. Simmons' employment with UBS or the termination of his employment with UBS.

8.     Mr. Simmons' daughter, Jo Aldridge, was an employee of UBS and remained an employee after Mr. Simmons' departure.  Several months after the end of Mr. Simmons' employment with UBS, Ms. Aldridge made an internal complaint of pregnancy discrimination.  In December 2015, Ms. Aldridge filed a charge of discrimination with the EEOC.

9.     In April 2016, while Ms. Aldridge was on maternity leave, Mr. Simmons noticed that Ms. Aldridge's office had been emptied and that her nameplate had been removed.  He reported this to his daughter.  At this point, UBS began to take adverse actions against Mr. Simmons.  It started when the manager of the downtown Houston office accused him of taking pictures in the office (apparently believing that Mr. Simmons was gathering evidence for the EEOC proceeding).  In fact, Mr. Simmons had taken no pictures.  UBS restricted Mr. Simmons' access at the downtown office to the lobby conference room unless accompanied by a UBS

2

financial advisor.  This restriction did not apply to other third-party wholesalers and thus was based solely on Mr. Simmons' relationship to Ms. Aldridge.

10. Mr. Simmons discussed these developments with Prelle Financial and expressed concern that this was connected to his daughter's claim against UBS.  He continued doing business at UBS as usual, aside from the restriction at the downtown office of UBS.

11. Around May 2016, UBS replaced the Houston office manager.  The new manager told Mr. Simmons that, if he had been in charge, he would have done things very differently.  He then began lecturing Mr. Simmons about "taking pictures" in the office.

12. During the summer of 2016, Ms. Aldridge resigned her position at UBS.  She would eventually settle her claims against UBS.

13. Also in the summer of 2016, UBS apparently instructed Prelle Financial that UBS did not want Mr. Simmons to continue working in their offices in any capacity.  Mr. Simmons could finish out the life insurance cases he was working on, but that was it.  In September 2016, Warren Prelle informed Mr. Simmons of this development.  After Mr. Simmons repeatedly pressed for an explanation, Mr. Prelle eventually claimed that UBS gave no reason for this instruction.  UBS's instruction caused Mr. Simmons's pipeline of new business to dry up.  Prelle Financial told Mr. Simmons to keep working and to see what happened.

14. Much later, UBS claimed that its instruction was a result of a review of existing vendors and that it determined that Mr. Simmons was not meeting its "performance needs." Given that Mr. Simmons had been working with UBS clients for many years with considerable success, this was a transparent pretext for retaliation and not a legitimate basis for the decision.

15. A few months later, UBS apparently claimed that Mr. Simmons had made a "ticketing" error and told Prelle Financial that it would no longer allow Mr. Simmons to do any

business with its clients. This claim was not true (Mr. Simmons did not even have access to the ticketing system) and, in any event, would not have been a ground for barring Mr. Simmons from working with UBS clients. It was, once again, a transparent pretext for retaliation.

16. Prelle Financial informed Mr. Simmons of this development in February 2017. This effectively ended Mr. Simmons' employment. In fact, Warren Prelle told Mr. Simmons that Prelle Financial would need to part ways with him. Later, Prelle Financial gave him the option of receiving a severance payment in exchange for a release of all claims, but Mr. Simmons refused to release his claims. Prelle Financial told him that he could continue to work for Prelle Financial, but not at UBS. Fred Prelle, the owner of the company, told him that he hoped that Mr. Simmons would not choose that option. Fred Prelle also told Mr. Simmons that pursuing litigation against UBS would endanger Prelle Financial's relationship with UBS. Mr. Simmons eventually elected not to continue working for Prelle Financial.

17. Mr. Simmons filed charges of discrimination with the EEOC in March 2017. The EEOC issued right to sue letters on June 3, 2019.

18. All conditions precedent have occurred or been satisfied.

## Claim 1: Retaliation by UBS and Prelle Financial

19. Mr. Simmons' daughter engaged in protected activity by opposing pregnancy discrimination in violation of Title VII of the Civil Rights Act of 1964. She later participated in an EEOC proceeding, and UBS believed that Mr. Simmons was also participating in that proceeding.

20. UBS retaliated against Mr. Simmons for his daughter's protected activity and for what it perceived as his own protected activity by restricting and then barring his continued

4

business activities at UBS. This type of conduct would tend to dissuade a reasonable employee, such as Mr. Simmons' daughter, from exercising her rights under Title VII.

21. Mr. Simmons is a "person aggrieved" within the meaning of 42 U.S.C. § 2000e-5(f) because he was the target of the retaliation. Although he was not an employee of UBS at the time of the events in question, he was within the zone of interests protected by Title VII.

22. Prelle Financial is responsible for this retaliation because (a) it participated in the retaliation, and (b) it knew or should have known about the client's discrimination and failed to undertake prompt corrective measures within its control. After Mr. Simmons filed a charge of discrimination against UBS, contrary to Prelle Financial's expressed wishes, Prelle Financial withheld earned commissions from Mr. Simmons.

23. UBS and Prelle Financial are therefore liable to Mr. Simmons for back pay, loss of benefits, compensatory and punitive damages, reinstatement or in the alternative front pay, injunctive relief, attorneys' fees, pre- and post-judgment interest as provided by law, and all costs of court.

### Claim 2: Unpaid Commissions by Prelle Financial

24. In addition, Mr. Simmons earned approximately $60,000 in commissions at Prelle Financial which remain due, owing, and unpaid despite timely and repeated demands for payment.

25. Prelle Financial is therefore liable for the unpaid commissions, attorneys' fees under Chapter 38 of the Texas Civil Practice and Remedies Code, pre- and post-judgment interest as provided by law, and all costs of court.

For the foregoing reasons, UBS and Prelle Financial should be cited to appear and answer and, upon final hearing, the Court should enter judgment in favor of Mr. Simmons and against UBS and Prelle Financial for back pay, loss of benefits, compensatory and punitive damages,

reinstatement or in the alternative front pay, injunctive relief, attorneys' fees, pre- and post-judgment interest as provided by law, all costs of court, and any other relief to which he may be entitled.

        Respectfully submitted,

        /s/ David C. Holmes
        David C. Holmes, Attorney in Charge
        State Bar No. 09907150
        Southern District No. 5494
        13201 Northwest Freeway, Suite 800
        Houston, Texas 77040
        Telephone: 713-586-8862
        Fax: 713-586-8863

        ATTORNEY FOR PLAINTIFF